IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOSEPH HARWELL,

                      Plaintiff,                      OPINION AND ORDER

v.

                                                23-cv-318-wmc

KATHIE KLINGER-BERG, CASEY DORN,
LEAHANNA KIRZAN, and MARK LEDESMA,

                      Defendants.

      Plaintiff Joseph Harwell, a former inmate who is represented by counsel, is proceeding on Eighth Amendment deliberate indifference and state law medical negligence claims against his physician and three nurses at Department of Correction's ("DOC's") Stanley Correctional Institution. Generally, plaintiff alleges in his complaint that defendants failed to properly diagnose and treat his Methicillin-resistant Staphylococcus aureus ("MRSA") infection in 2022. More specifically, he alleges that: (1) Nurse Casey Dorn intentionally falsified plaintiff's medical records to downplay the seriousness of his condition and arbitrarily disagreed that MRSA was responsible for plaintiff's severe shoulder pain in July 2022; (2) Nurse Kathie Klinger-Berg stopped plaintiff's antibiotic (Bactrim), falsely stated that he received it, told plaintiff that he was not a medical priority and did not need Bactrim, and did nothing in response to plaintiff's complaint that he did not receive antibiotics and physical therapy as prescribed; (3) Nurse Leheanna Kirzan did not ensure that plaintiff received physical therapy in a timely manner; and (4) Dr. Mark Ledesma discontinued plaintiff's prescription for Ensure nutritional supplement without good reason after his August 2022 surgery. (*See* dkt. ##1 and 8.) Currently pending before the court are the parties' cross motions for summary judgment. (Dkt. ##32 and 40.)

A review of the parties' submissions shows that the material facts concerning plaintiff's treatment are not in dispute because he failed to respond to any of defendants' proposed findings of fact.[1]  Rather, plaintiff proposed a few, non-material, factual findings of his own, most of which are not supported by admissible evidence except plaintiff's own vague allegations in his unsworn complaint.  However, plaintiff does not have the personal knowledge or expertise required to support his arguments that defendants should have:  (1) known his MRSA infection spread from his left armpit to his right shoulder, even though *no* doctor ever determined that to be the case; and (2) continued him on Ensure in *August 2023*, after a 2023 magnetic imaging study revealed osteophytosis in his shoulder joint.[2]

In short, not only has plaintiff failed to support his existing claims with admissible evidence, he has not even addressed any of the named defendants' individual conduct (failing to even mention any defendant by name), and as just noted, inappropriately now bases one of his claims on *new* allegations involving a denial of Ensure as a result of events occurring outside the scope of this lawsuit.  As a result, by failing to address the claims in either his motion or in his response to defendants' motion, the plaintiff has effectively abandoned his federal

---

[1] This is not the first time plaintiff's counsel has failed to comply with this court's summary judgment rules.  *E.g.*, *Peterson v. Wright*, No. 21-CV-799-JDP, 2023 WL 5448027, at *1 (W.D. Wis. Aug. 24, 2023); *Ferguson v. McMartin et al.*, No. 21-CV-593-WMC, dkt. #52, at 2 n. 1 (W.D. Wis. Jan. 30, 2024).  In *Ferguson*, I specifically warned counsel that his continued failure to follow procedures may well result in the court wholly adopting the opposing party's proposed findings of fact to the detriment of his future clients, as is the case here.

[2] In contrast, plaintiff does not discuss in any detail the alleged discontinuance of his Ensure in 2022, which is the only claim involving Ensure for which he was granted leave to proceed, nor has he ever sought leave to amend his complaint to add a claim that his Ensure was also discontinued without reason in 2023.  *See Pegues v. Hoffmann*, No. 22-cv-352-jdp, 2024 WL 519544, at *2-6 (W.D. Wis. Feb. 9, 2024) (citing *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.")).

deliberate indifference claims regarding defendants' alleged falsification of medical records, denial of antibiotics, delayed physical therapy, and discontinuation of Ensure in 2022. As for plaintiffs' remaining federal claims, the evidence shows overwhelmingly that defendants are entitled to summary judgment on the merits, so the court will not address defendants' alternative, qualified immunity defense. Accordingly, the court will grant defendants' motion for summary judgment as to plaintiff's federal claims, deny plaintiff's motion for summary judgment, and decline to exercise supplemental jurisdiction over plaintiff's state-law medical negligence claims.

UNDISPUTED FACTS[3]

**A. Background**

On March 16, 2022, plaintiff Joseph Harwell was reincarcerated at Dodge Correctional Institution following the revocation of his extended, state supervision. He was then transferred to Stanley Correctional Institution on May 5, 2022.[4]

Defendant Dr. Mark Ledesma is employed as a physician at Dodge, where he conducted plaintiff's admission physical on April 1, 2022, and later issued orders in August and September 2022, following plaintiff's post-surgical stay in Dodge's infirmary. Defendants Kathie Klinger-Berg, Casey Dorn, and Leheanna Kirzan are all employed as nurse clinicians at Stanley, where they also provided care to plaintiff in 2022.

---

[3] Unless otherwise indicated, the following facts are material and undisputed for purposes of summary judgment as drawn from the parties' proposed findings of fact and responses, uncontested expert opinions regarding plaintiff's care and treatment, BHS policies and procedures, and standards of care offred by BHS Associate Medical Director, Dr. Laura Sukowaty, as a non-retained expert witness (*see* dkt. #28).

[4] On March 19, 2024, plaintiff was again released from custody on extended supervision.

3

B. **Routine Inmate Medical Care at Stanley**

Under the supervision of the health services manager ("HSM"), nurse clinicians provide skilled nursing care to inmates, including patient assessment and treatment, triaging patient concerns for Advanced Care Providers ("ACPs"), assisting physicians and nurse practitioners, managing medications, providing emergency care, and maintaining medical records. Other than nurse practitioners, nursing staff do not have the authority to prescribe any medication other than over-the-counter drugs, refer patients to offsite specialists, order imaging studies, or override an ACP's treatment decision. Physicians and nurse practitioners provide advance medical services to inmates, including diagnoses, treating illness and injuries, and arranging for outside professional consultation.

Nursing staff at Stanley are the first point of contact for patient medical issues or concerns and handle patient concerns that do not require attention from an ACP. They triage any remaining patient concerns to ensure that an ACP sees those patients with the most urgent medical needs first. ACPs staff Stanley's Health Services Unit ("HSU") on weekdays from approximately 7:00 a.m. to 4:00 p.m. During evenings and weekends, an ACP remains on-call.

For non-emergency symptoms and issues not requiring an ACP's evaluation, nursing staff typically work with the patient to rule out simple causes and find a solution through education and over-the-counter medications, following the nursing protocols established by the DOC's Bureau of Health Services ("BHS"). Those nursing protocols typically act as a reference for triaging and addressing patient concerns, indicating what symptoms or signs require medical attention by an ACP, and how urgently an appointment with an ACP should be scheduled for those issues. For non-urgent medical issues that do not require an ACP, the protocols provide recommendations for nurses and education reminders for the patient. If the nursing protocol

4

does not resolve or improve the issue, the inmate patient is generally referred to an ACP for follow-up.

Under ordinary circumstances, should an inmate have a medical concern, seek to communicate with medical staff, or want to be seen by HSU staff, he must submit an HSR. Once a day, nursing staff triage all HSRs, regardless of whether the HSR is directed to the HSM or a specific staff member. Typically, a single triage nurse first uses their training and judgment to prioritize appointments and inmate needs, and then places a response to the HSR in that inmate's personal medical record, indicating whether the inmate is scheduled to be seen, referred to another staff member, referred for copies or a record review, or provided with education materials. The nurse responder may also make written comments.

In addition, an inmate may be referred to an independent, offsite ACP. However, any recommended change to an inmate's prescription or treatment is up to DOC ACPs, who are not required to follow recommendations from offsite ACPs. In particular, offsite ACPs do not have prescription authority within DOC institutions, for obvious reasons. Instead, when an inmate patient returns from an offsite visit with a prescription, the DOC ACP is responsible for reviewing the recommendation and deciding whether it is appropriate for an institution setting. If a DOC ACP is unavailable or not currently at the institution, nursing staff handle offsite return visits by reviewing the recommendations and any necessary education and instructions for self-care with the inmate patient, as well as informing the patient that the recommendations will be reviewed by the ACP.

Finally, inmates in need of increased or complex medical care may be sent to Dodge Correctional Institution's Medical Infirmary, which is an inpatient clinic providing 24-hour skilled nursing with certified nursing assistants and increased staff. For example, that infirmary

may handle joint replacements, post-surgery care, wound care, administration of intravenous antibiotics, intensive physical therapy, or palliative care. Unless an inmate has a progressive or terminal illness, they are then generally discharged back to their home facility once their need for skilled care has passed. Further, when transferred from Dodge's facility to their home facility, an inmate's prescriptions must be discontinued and reordered by the receiving HSU's outpatient clinic because DOC's infirmary and other institution's outpatient clinics constitute separate sections of an inmate's electronic medical record ("EMR"). This practice also allows for a review of the prescriptions to determine whether they are medically necessary to continue after discharge from the infirmary.

### C. Plaintiff's Symptoms and Treatment

During his initial intake health assessment at Dodge on March 16, 2022, plaintiff reported that he had injured his neck when hit by a car in September 2021, and that he has experienced intermittent numbness in his hand ever since. He also reported experiencing chest pain lasting 2.5 to 3 hours and numbness in both of upper extremities while housed at a jail the previous evening, but he stated that he felt better after the jail nurse took his vitals and gave him a snack. While plaintiff further reported having some anxiety and continued breathing difficulty on March 16, 2022, he denied having any chest pain.

On April 1, 2022, defendant Dr. Ledesma conducted an admission history and physical on plaintiff, noting no known deformities in plaintiff's extremities. Dr. Ledesma also advised plaintiff to fill out an HSR form (also known as a "blue slip") if he had any future medical needs.

### 1. Left Armpit Abscess and MRSA Diagnosis

After his transfer to Stanley, plaintiff submitted an HSR on July 6, 2022, asking to be seen for an uncomfortable bump under his left armpit. Plaintiff was seen by nursing staff the next day for what appeared to be a grape-sized lump that was firm but movable, with slight redness, no warmth, and no pain to the touch. He was advised to use a hot pack throughout the weekend because the bump was consistent with an inflamed cyst or hair follicle, as well as given Band-Aids to keep it covered.

Nurse Klinger-Berg saw plaintiff for a follow-up visit on July 11, 2022, noting that he had erythema (skin or mucous membrane redness), a non-blanchable abscess (skin discoloration does not turn white when pressed), induration (a thickening and hardening of skin), and that the area had a soft center after the warm pack applications over the weekend. Dr. Filipescu (not a defendant) then diagnosed plaintiff with a left-shoulder abscess,[5] which he incised and drained for plaintiff with Nurse Klinger-Berg's assistance. Dr. Filipescu further obtained a wound culture, ordered that the wound be packed with an antiseptic and covered, and ordered Ibuprofen for pain. Klinger-Berg then provided plaintiff with patient education instructions regarding the abscess incision and drainage, advising him to be alert for signs and symptoms of potential infections or complications.

On July 13, 2022, another defendant, Nurse Kirzan, saw plaintiff for a dressing change, noting no redness surrounding his wound area, the wound was beefy red, and the induration (thickening) surrounding the area had decreased, all of which are generally good signs. Kirzan then cleaned, packed, and covered the wound once again, noting that (1) there was minimal

---

[5] According to defense expert, Dr. Sukowaty, an abscess is a swollen area within body tissue that contains an accumulation of pus, which *may* happen as a result of the body fighting an infection.

purulent (pus) drainage on the old gauze, and (2) plaintiff had showered prior to arriving in the HSU. Plaintiff was also scheduled to return for another dressing change the next day.

At approximately 9:02 a.m. on July 14, 2022, however, Stanley's nursing staff learned that plaintiff's wound was positive for MRSA, a type of bacteria that can cause staph infections in humans and sometimes be resistant to several antibiotics. At approximately 2:48 p.m. that same day, Nurse Klinger-Berg saw plaintiff for wound care and a dressing change, noticing trace drainage on the dressing and packing saturated with brown, slightly-slimy drainage with a mild odor. Defendant Klinger-Berg flushed the wound with commercial wound cleanser, then repacked it with approximately four inches of Iodoform gauze. Klinger-Berg also "charted" plaintiff's reports of feeling warm the night before and diaphoretic (sweaty) at one point. She further noted that plaintiff had a low-grade temperature, tachycardia (faster than normal heart rate), and poor appetite.

Because the wound was positive for MRSA, Dr. Filipescu next ordered a 10-day supply of antibiotics to be sent with plaintiff as a keep-on-person ("KOP") medication.[6] On July 15, 2022, Nurse Dorn saw plaintiff for a dressing change, during which he reported joint pain and feeling poorly. Dorn discussed the planned antibiotic therapy and symptom control, also telling plaintiff that he would have daily assessments and dressing changes. Dorn saw plaintiff again on July 16 and 17, 2022, for dressing changes, but saw no reason for further intervention because plaintiff's wound was healing well. On July 17, Dorn further noted that the wound

---

[6] Inmates receive a full supply of KOP medication to keep with them in their cell and take as instructed at the right dose and time, rather than having the medication kept with security staff and having security staff administer doses.

appeared beefy red, consistent with good healing, and the mild redness in the area from the dressing tape.[7]

Plaintiff continued to have daily dressing changes for the wound on his left armpit. By July 21, 2022, Nurse Klinger-Berg noted minimal drainage on the previous dressing change, as well as that his wound site was almost closed. She then flushed plaintiff's wound with hydrogen peroxide, noted minimal bubbling of fluid that indicated minimal infection; repacked and covered the wound; and noted that they would do one, additional dressing change regarding plaintiff's left arm, as well as consider switching to a selfcare dressing change going forward. On July 22, 2022, Klinger-Berg was unable to pack any Iodoform in plaintiff's wound because it had healed, so she instructed plaintiff to cover the wound with Mepilex dressing covers and change them daily himself.

### 2. Right Shoulder Septic Arthritis

During an additional wound check of plaintiff's *left* arm on July 17, 2022, Nurse Dorn also noted a soft mass in plaintiff's *right* arm, which he suspected was an acute musculoskeletal strain due to plaintiff's increased use of his right arm to compensate for the limited use of his left arm. Accordingly, Dorn ordered topical lidocaine and advised self-massage.

On July 19, 2022, during his regular dressing change, plaintiff again reported to Klinger-Berg right shoulder pain, preventing him from sleeping. In response, Klinger-Berg gave plaintiff Tylenol, an ice bag, and lidocaine under the musculoskeletal nursing protocol. She also instructed him on exercises to reduce his shoulder pain, stating that she would follow up the

---

[7] Plaintiff's own, additional reports that the July 17 visit included his right shoulder and arm pain, as well as back pain, are discussed separately below.

next day regarding physical therapy ("PT"). When Klinger-Berg saw plaintiff on July 20, she noted that he still had pain in his right shoulder with any type of movement and sent him to PT. On July 21, plaintiff reported to Klinger-Berg that after completing the exercise program that PT had given him the day before, he had an increased range of motion in his right elbow and was able to lift his arm above his shoulder.

On July 25, 2022, plaintiff next saw Nurse Krizan for a follow-up on his left armpit and evaluation of his limited range of motion, during which he reported pain of 8 out of 10 in his right arm and shoulder. Given what Krizan knew at the time, including that plaintiff had seen PT and had another appointment with PT scheduled in two days, she believed that plaintiff's pain would be most appropriately addressed by PT.

On July 27, 2022, however, the physical therapist noted an unusual mass in plaintiff's shoulder, as well as his reports of worsening pain, night sweats, and not feeling well. The same day, a physician saw plaintiff on an emergent basis, had labs drawn, and sent him to a local hospital. That physician also ordered that plaintiff be transferred for CT scans of the mass at the same hospital. Subsequent testing, including imaging and a biopsy, ruled out cancer but revealed a bacterial infection.

On July 28, 2022, an orthopedic surgeon diagnosed plaintiff with septic arthritis of the right shoulder with an abscess and recommended surgery to drain, irrigate, and debride the area.[8] Plaintiff underwent incision drainage and irrigation debridement on August 1, 2022, and was transferred to the infirmary at Dodge on August 11, 2022, due to his need for a

---

[8] According to Dr. Sukowaty, septic arthritis is a painful infection in a joint that can come from germs traveling in the bloodstream from another part of the body. Septic arthritis can also occur when a penetrating injury, such as an animal bite or trauma, delivers germs directly into the joint. Treatment typically involves draining the joint with a needle as here, in surgery, plus administering antibiotics.

peripherally inserted central catheter ("PICC") line for a six-week course of intravenous antibiotics. On August 12, 2022, plaintiff was also issued a prescription for Ensure and recommended for physical therapy three times a week for six weeks. Plaintiff received 10 physical therapy sessions during his stay at Dodge from August 16 through mid-September 2022. Further, his specialists recommended that plaintiff continue intravenous antibiotic therapy until September 12, 2022, when he started a two-week course of oral antibiotics.

Plaintiff was discharged from the infirmary and transferred back to Stanley on September 21, 2022. Per DOC policy, all of plaintiff's medications, including his Ensure, were discontinued and would be reordered by Stanley's outpatient clinic as needed. On September 22, Nurse Dorn messaged DOC providers to have plaintiff's medications and PT reordered at Stanley. She also reexamined plaintiff that same day, noting that he had a well-healed surgical scar and full range of motion in his right arm. While a three-day supply of plaintiff's oral antibiotic was ordered KOP ("Keep On Person") on September 23, defendant Dr. Ledesma discontinued plaintiff's Ensure because it was no longer medically required for his post-surgical healing. Plaintiff resumed PT at Stanley on September 26, 2022, for a total of six sessions, during which he greatly improved his range of motion. On October 12, 2022, an x-ray showed no acute abnormalities in plaintiff's right shoulder.

### D. Dr. Sukowaty's Expert Opinion

Finally, Dr. Sukowaty's uncontroverted expert opinion is that plaintiff had two, separate medical conditions -- a left armpit abscess and septic arthritis in the right shoulder -- that were not knowingly related because plaintiff's specialists never determined the cause of plaintiff's septic arthritis. Dr. Sukowaty also opines that: (1) the nursing defendants' response

11

and actions with respect to plaintiff's left armpit abscess fell within relevant nursing standards of care; and (2) plaintiff's abscess healed properly with the treatment provided to him. Because plaintiff first complained of right shoulder pain three days after starting antibiotics for his left armpit abscess, Dr. Sukowaty further opines that HSU staff correctly considered his right shoulder pain as separate and distinct from the left shoulder abscess and further provided plaintiff with the appropriate standard of care throughout his recovery from that condition. In particular, only a week and a half elapsed between plaintiff's first complaint of right arm/shoulder pain and his admission to the hospital, which Sukowaty considers to be a very good, short timeline for addressing and diagnosing septic arthritis.

## OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

However, summary judgment has also been referred to as the "put up or shut up" moment for parties seeking to take their claims to trial, at least in the Seventh Circuit. *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Specifically, plaintiff must "do more than simply show that there is some metaphysical doubt as to the

material facts"; he must respond to defendants' showing of a lack of material disputes of fact by designating specific facts in affidavits, depositions, answers to interrogatories or admissions that establish there is a genuine triable issue. *Anderson*, 477 U.S. at 256-57, 261. Moreover, because those facts must be admissible at trial, plaintiff may not rely on inadmissible hearsay, speculation, or conclusory allegations to defeat summary judgment. *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999). Finally, a factual dispute can preclude summary judgment only if the facts "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

As previously discussed, plaintiff contends that the named defendants as a whole: (1) disregarded his MRSA symptoms and failed to conduct appropriate physical examinations, which caused him to develop sepsis in his right shoulder, which persisted without treatment until July 28, 2022; and (2) should have continued to prescribe him the nutritional drink Ensure in September 2023, because his 2023 MRI revealed that he had mild osteophytosis (bone spurs) in his right shoulder. Plaintiff's second claim fails at the outset because it is outside the scope of the leave given for this lawsuit. Even if 2023 events were appropriately before the court for consideration, plaintiff also offers *no* admissible evidence that Ensure would have helped treat his bone spurs. Therefore, the court will not discuss this claim further.[9] After reviewing plaintiff's pleading, briefs, and the evidence of record in the light most favorable to him regarding his first claim, plaintiff has also failed to demonstrate that any of the defendants acted with deliberate indifference to either his left armpit or right shoulder symptoms and conditions. Accordingly, the court must dismiss plaintiff's Eighth Amendment claims and

---

[9] Again, plaintiff does *not* dispute Dr. Ledesma's exercise of medical judgment not to renew his Ensure prescription in September 2022, when he was transferred from the Dodge infirmary back to Stanley.

13

decline to exercise supplemental jurisdiction over plaintiff's remaining state law negligence claims.

### A. Eighth Amendment

The Eighth Amendment's prohibition on cruel and unusual punishment prohibits prison officials from acting with "deliberate indifference" to a "substantial risk of serious harm" to a prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). As applied here, the Eighth Amendment prohibits prison officials from acting with deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a medical deliberate indifference claim, a prisoner must present evidence from which a reasonable jury could find: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent to that need. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).

A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). However, the condition does not have to be life threatening, *id*., and may be serious if it causes significant pain, *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer*, 511 U.S. at 825. "Deliberate indifference" means that the officials are aware a prisoner needs medical treatment, but disregard the risk presented by consciously failing to take reasonable measures. *See Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).

"[I]n cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay

(rather than the inmate's underlying condition) caused some degree of harm." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (citation omitted). Additionally, when a prisoner alleges that he received some treatment for his medical condition, but it was inadequate, the relevant question is whether the medical provider's actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). Thus, courts typically defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Here, plaintiff had *two* objectively serious, medical conditions for which he sought and received treatment in 2022: (1) a left armpit abscess initially reported on July 6, 2022, and later discovered to be MRSA on July 14, 2022; and (2) right shoulder pain initially reported on July 17, 2022, and later discovered to be septic arthritis on July 28, 2022. While plaintiff admits that nursing staff saw him almost daily for his left armpit abscess between July 7 and 27, 2022, he nevertheless argues that he did not receive the diagnosis and treatment he needed because he developed septic arthritis in his right shoulder, which should have been discovered before July 28, 2022. To prevail at trial, however, plaintiff must offer sufficient evidence from which a reasonable jury could find that *each* defendant should personally have known from plaintiff's symptoms that he faced an obvious risk of septic arthritis in his right shoulder and consciously failed to take reasonable measures to ensure plaintiff received any diagnosis and treatment he needed.

At summary judgment, the undisputed evidence actually shows that starting on July 7, 2022, HSU staff responded to all of plaintiff's complaints and symptoms in a timely manner, evaluating him almost daily, and providing him with various, over-the-counter medications, comfort recommendations, and referrals. While plaintiff believes that HSU staff should have known that his MRSA infection had spread to his right shoulder, he fails to identify how any of the individual defendants' treatment was a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that they did not base their treatment decisions on such a judgment. Indeed, even if a different provider might have later concluded that there was a connection between plaintiff's healed, left armpit infection and his right shoulder discomfort, defendants' failure to recognize any such link does *not* constitute a constitutional violation in this instance because there is *no* evidence that plaintiff's right shoulder symptoms were consistent *only* with MRSA, or that a different course of treatment was required. *See Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485 (7th Cir. 2022) (The necessity of a diagnostic measure or specialty consultation may be debatable among physicians, but that alone "hardly demonstrates a reckless disregard for [an inmate's] well-being" or indicates a provider "ignored the gravity of [inmate's] condition or 'slow-walked' his treatment plan."); *Pyles*, 771 F.3d at 409 (disagreement between prisoner and his provider or even between two medical professionals about proper course of treatment is insufficient by itself to establish Eighth Amendment violation); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (inmates are not entitled to demand specific medical care); *Fromm*, 94 F.3d at 263 (discussing how obvious plaintiff's symptoms needed to be to rise to level of deliberate indifference to serious medical need).

To the contrary, defendants' expert, Dr. Sukowaty, has issued an undisputed opinion that there was, and still is, no way of knowing whether plaintiff's two health conditions were even related. While plaintiff also generally contends that the nursing care he received was ineffective, he has wholly failed to show that it was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate [his] condition," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), or so egregious that "no reasonable official could have thought he was acting lawfully," *Stockton*, 44 F.4th at 620-21. Accordingly, defendants are entitled to summary judgment on plaintiff's Eighth Amendment claims, which will be dismissed.

### B. State Law Claims

Plaintiff's remaining medical negligence claims against defendants under Wisconsin law are only before this court through exercise of supplemental jurisdiction under 28 U.S.C. § 1367(a). However, the court has dismissed all of plaintiff's federal claims, and plaintiff has not alleged *any* other basis for the exercise of federal jurisdiction over these state-law claims now that his federal constitutional claims are resolved. Absent unusual circumstances, district courts must relinquish supplemental jurisdiction over state-law claims if all federal claims have been resolved before trial. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). Since neither party identifies any unusual circumstances that would justify retaining jurisdiction over plaintiff's state-law negligence claims, the court will decline to exercise subject matter jurisdiction over those remaining claims.

ORDER

IT IS ORDERED that:

1) The motion for summary judgment filed by defendants (dkt. #32) is GRANTED, and plaintiff Joseph Harwell's motion for summary judgment (dkt. #40) is DENIED.

2) Plaintiff's Eighth Amendment claims are DISMISSED WITH PREJUDICE and his state law claims are DISMISSED WITHOUT PREJUDICE under 28 U.S.C. § 1367(c)(3).

3) The clerk of court is directed to enter judgment consistent with this order and close this case.

Entered this 5th day of May, 2025.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge